UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------X
MICHAEL MADISON,

               Petitioner,

       -against-

SUPERINTENDENT J. COLVIN,

               Respondent.
----------------------------------------------------------X

**FILED**
**CLERK**

7/24/2019 9:05 am

**U.S. DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
**LONG ISLAND OFFICE**

For Online Publication Only

**MEMORANDUM AND ORDER**
17-CV-7250

**AZRACK, United States District Judge**

       Petitioner Michael Madison (the "Petitioner"), proceeding pro se, petitions this Court for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. (ECF No. 1, the "Petition.") After a jury trial in Suffolk County Court (the "County Court"), Petitioner was convicted of one count of burglary in the first degree and one count of unauthorized use of a motor vehicle in the first degree. Petitioner is currently serving a determinate sentence of 20 years imprisonment for the burglary in the first degree conviction, together with an indeterminate term of 3.5 to 7 years imprisonment for the unauthorized use of a motor vehicle in the first degree conviction, with the sentences running concurrently.

       In the instant petition, Petitioner asserts five grounds for habeas relief. For the following reasons, the Petition is DENIED in its entirety.

## I.      BACKGROUND

       Petitioner was arrested in connection with a home burglary and motor vehicle accident that took place in the early morning of May 8, 2009. Joseph Lobiondo ("Lobiondo") awoke to find an intruder in his apartment going through his belongings. Lobiondo confronted the individual, who struck him and fled. Around the same time, the police received a second call reporting a motor vehicle accident about a quarter mile away from Lobiondo's home. A vehicle was found in the

yard of a home with deployed airbags. Petitioner was arrested two days later, in the early morning of May 10, 2009.

## A. <u>Pre-Trial Identification and Proceedings</u>

When the police arrived at Lobiondo's residence, Lobiondo described the intruder as a black man wearing a black baseball cap, about 5'10" with a skinny build, who looked to be about 20 years old. (July 20, 2010 Trial Tr. ("July 20 Tr."), ECF No. 6-11, 69:17–25; July 29–Aug. 2, 2010 Trial Tr. ("July–Aug. Tr."), ECF No. 6-15, 375:4–9.) Lobiondo indicated that there was something familiar about the intruder—he recognized him from years ago in the neighborhood— and he mentioned the name "Black Mike" to the police. (July–Aug. Tr., 347:2–15.)

Later that morning, Lobiondo went to Brookhaven Memorial Hospital to get stitches for the injury he sustained when the intruder struck him. (<u>Id.</u> 347:16–20.) Detective Acer visited Lobiondo at Brookhaven Hospital with a photo array of individuals who matched the description of the intruder. (Photo Line-Up, ECF No. 8-1; Huntley/Wade Hearing, Jan. 20, 2010, ECF No. 6-6, 7:20–13:19.) Detective Acer and told Lobiondo that he was going to show him a series of photos and asked him to indicate if the intruder was depicted in the photos. (Huntley/Wade Hearing, 9:22–10:3.) Lobiondo immediately identified Petitioner. (<u>Id.</u> 10:4–9.)

Petitioner was arrested in the early morning of May 10, 2009 and taken into police custody. (July 27–28, 2010 Trial Tr., ("July 27–28 Tr.") ECF No. 6-14, 253:3–254:13.) Upon arrest, the officer found two cell phones on Petitioner's person, one of which depicted a photo of a child on it when opened. (<u>Id.</u> 254:14–23, 255:18–256:5.) Petitioner was first read his <u>Miranda</u> rights at the Seventh Precinct the morning of his arrest, which he waived. (<u>Id.</u> 8:14–20:5.) At approximately 11:00 a.m., Detective Palazzolo conducted a corporeal lineup, viewed by Lobiondo, consisting of six people, including Petitioner, all wearing the same white Tvek suit. (ECF Nos. 8-2, 8-3;

2

Huntley/Wade Hearing, 17:17–27:21.)  Detective Palazzolo explained to Lobiondo that he was going to be shown a group of people, one of whom might have been involved in the crime, and asked him to identify anyone involved.  (Huntley/Wade Hearing, 21:10–24.)  Upon viewing the lineup, Lobiondo identified Petitioner, who was holding number two, as the intruder.  (<u>Id.</u> 24:8–25:8.)  Lobiondo was then removed from the area and the lineup was rearranged (with the same individuals).  (<u>Id.</u> 25:9–20.)  Lobiondo again identified Petitioner, this time holding number six, from the second, rearranged lineup.  (<u>Id.</u> 25:21–27:21.)

Later that same day, at approximately 2:30 p.m., Petitioner was again advised of his <u>Miranda</u> rights by Detective Harris, which he again waived and then proceeded to confess to the crimes.  (<u>Id.</u> 63:10–69:6.)  Petitioner indicated that he took a car belonging to a girl named Kelsey, drove it to Lobiondo's house, climbed into Lobiondo's window, took some items, hit Lobiondo, and while he meant to return the car, he ultimately crashed it and left it at the crash site.  (<u>Id.</u> 69:7–71:10.)  Petitioner signed a sworn statement containing those admissions prepared by Detective Harris.  (<u>Id.</u>)

Petitioner subsequently moved to suppress the identification testimony and incriminating statements.  The County Court held a <u>Huntley/Wade</u> hearing, and issued a written decision denying Petitioner's motion on July 9, 2010.  (Huntley/Wade Hearing; County Court Decision, July 9, 2010, ECF No. 8.)  The County Court determined that Petitioner had been properly advised of his <u>Miranda</u> rights and none of his statements were involuntary or coerced.  (County Court Decision, July 9, 2010.)  The County Court further held that the photo array and corporeal lineup "were not in the least suggestive," nor did the detectives' actions and words used in interacting with Lobiondo "give rise to an inference of improper behavior."  (<u>Id.</u>)

**B. Trial**

Prior to jury selection, which began on July 15, 2010, Petitioner's assigned attorney was injured, requiring hospitalization, and Petitioner was assigned a new attorney, Daniel Russo, pursuant to County Law Article 18-b. (July 15–16, 2010 Trial Tr. ("July 15-16 Tr."), ECF No. 6-8, 4:1–7.) When questioned by the trial court judge, Petitioner confirmed that he approved of the appointment of Mr. Russo to represent him. (Id. 4:8–11.)

The parties then picked a jury and the trial commenced. The prosecution presented overwhelming evidence against Petitioner, including his sworn confession (see July–Aug. Tr., 476:4–478:6, 482:24–483:23), and testimony from various individuals. One witness was Kelsey Mitchell, who owned the 2001 Saab that crashed near the scene of the crime. (See July 20 Tr., 104:6–107:14.) Mitchell expressed that Petitioner was a friend of both her roommate and boyfriend who had stayed the night at their apartment on the night of May 7, 2009. (Id. 108:10–112:9.) She indicated that Petitioner did not have permission to use her car. (Id. 119:2–13.) She testified that when she awoke the morning of May 8, 2009 and found her car missing, she called the police. (Id. 113:17–115:10.) When she relayed this information to Petitioner, she said he acted nervously and asked her if the police told her anything. (Id.) The prosecution also presented evidence that Petitioner's DNA was found on the driver's side airbag that was deployed at the scene of the accident. (July 22, 2010 Trial Tr., ECF No. 6-13, 61:13–62:25.)

Another witness, Michael Desantis, testified that he grew up with Petitioner, who was known by the nickname "Black Mike," and that Desantis obtained employment for Petitioner in the spring of 2009. (July 21, 2010 Trial Tr., ECF No. 6-12, 14:7–16:8.) After finding out that Mitchell's car was missing, Desantis went to her apartment and went through Petitioner's belongings (in his absence) to pick up some thing he had given to Petitioner, and found a camera

4

containing photos of Lobiondo's family, together with jewelry and car keys. (Id. 21:17–23:14.) Desantis, who was friends with Lobiondo's family, returned the items to Lobiondo. (Id. 22:11–23:18.) Lobiondo's father later showed these items to the police. (July 27–28 Tr., 105:1–23, 109:2–13.)

Lobiondo also testified about the incident, identifying Petitioner as the individual who broke into his home and punched him. (July–Aug. Tr., 345:25–346:9.) He also testified that one of the phones found on Petitioner when he was arrested was his mother's phone, and the photo of a child depicted on that phone was a photo of his son. (Id. 441:11–442:15.)

After more than five days of testimony from these and approximately a dozen other witnesses, the prosecution was on the verge of resting its case. At that time, on July 29, 2010, Petitioner asked to speak to the judge and requested to substitute Mr. Russo with an attorney he claimed his father wanted to hire. (Id. 411:15–412:2.) The trial court judge, recognizing the extremely late stage of the proceedings, denied Petitioner's application to retain new counsel, indicating that it was essentially a request for a mistrial, which he would not grant. (Id. 411:15–417:18.)

On August 4, 2010, the jury found Petitioner guilty of two of the three charged counts: Burglary in the First Degree (N.Y. Penal Law § 140.30) and Unauthorized Use of a Motor Vehicle in the First Degree (N.Y. Penal Law § 165.08). (Aug. 3–4, 2010 Trial Tr., ECF No. 6-16, 841:7–842:23.) On September 13, 2010, the County Court sentenced Petitioner to 25 years imprisonment for the conviction of burglary in the first degree, together with an indeterminate term of imprisonment of 3.5 to 7 years for the conviction of unauthorized use of a motor vehicle in the first degree, to run concurrently. (Sentencing Tr.)

## C. Direct Appeal and Post-Conviction Proceedings

Petitioner did not timely appeal his conviction, but eventually filed an application for a writ of error coram nobis seeking leave to file a late notice of appeal, which the Appellate Division, Second Department (the "Appellate Division") granted on January 15, 2014. People v. Madison, 113 A.D.3d 700, 978 N.Y.S.2d 694 (2d Dep't 2014). Petitioner then filed an appellate brief with assistance of counsel, raising six grounds for relief: (1) the failure to disclose the source who identified Petitioner for inclusion in the photo line-up constitutes a Rosario violation; (2) the identification procedures used were unduly suggestive; (3) the prosecution improperly bolstered a witness with a prior consistent statement; (4) Petitioner was denied his Sixth Amendment right to counsel; (5) trial counsel's failure to investigate the source of Petitioner's identification as a suspect violated his right to effective assistance of counsel; and (6) Petitioner's sentence was harsh and excessive. (See Def.-Appellant Br., ECF No. 6-1.)

On June 1, 2016, the Appellate Division affirmed Petitioner's conviction, but found that given his "age and background, and the circumstances of the burglary of which he was convicted, . . . the determinate term of imprisonment of 25 years imposed upon that conviction was excessive to the extent indicated herein [and] reduced his sentence of imprisonment to 20 years." People v. Madison, 140 A.D.3d 793, 33 N.Y.S.3d 358 (2d Dep't 2016). The Appellate Division denied the remainder of Petitioner's claims. Id. The Court of Appeals denied Petitioner's application for leave to appeal on September 2, 2016 and Petitioner did not seek certiorari from the United States Supreme Court. People v. Madison, 28 N.Y.3d 972 (2016).

Earlier, in May 2014, Petitioner had filed a pro se C.P.L. § 440.10 motion to vacate his conviction in the County Court. (Def.'s 440.10 Br., ECF No. 6-4, 1–9.[1]) Petitioner asserted that

---

[1] Citations correspond to the ECF pagination except in the case of transcripts.

his conviction should be vacated because he was incorrectly assumed to be a persistent violent felony offender during pre-trial plea negotiations, which caused him to receive a less favorable offer, and that his attorney's failure to identify this error denied him effective assistance of counsel. (Id.)  The County Court denied the motion on December 18, 2014.  (County Court Order, Dec. 18, 2014, ECF No. 6-5.)  Petitioner did not file an application for leave to appeal this decision.

## D.  **The Instant Petition**

The Petition is dated December 2, 2017 and was received by the Court on December 8, 2017.  (Pet.)  Petitioner seeks habeas relief on five grounds that were raised in either his direct appeal or pro se C.P.L. § 440.10 motion.

## II.  DISCUSSION

## A.  **Standards of Review**

### 1.  **Overview of AEDPA**

Congress enacted the Antiterrorism and Effective Death Penalty Act ("AEDPA"), Pub. L. No. 104–132, 110 Stat. 1214 (1996), to restrict the "power of federal courts to grant writs of habeas corpus to state prisoners."  Williams v. Taylor, 529 U.S. 362, 399 (2000) (O'Connor, J., concurring).  Under AEDPA, a district court will "entertain an application for a writ of habeas corpus [on] behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).  To make that showing, the petitioner must satisfy three hurdles: (1) the exhaustion of state court remedies, (2) the absence of a procedural bar, and (3) the satisfaction of AEDPA's deferential review of a state court decision. See 18 U.S.C. § 2254.

## 2. Statute of Limitations and Tolling

AEDPA sets a one-year limitations period for the filing of a petition for a writ of habeas corpus by a person in custody pursuant to a state court conviction. 18 U.S.C. § 2244(d)(1). The applicable one-year period runs from the date on which one of the following four events occurs, whichever is the latest:

> (A)    the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;
>
> (B)    the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;
>
> (C)    the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or
>
> (D)    the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

18 U.S.C. § 2244(d)(1)(A)–(D). AEDPA provides for tolling of the one-year period for "[t]he time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending." 18 U.S.C. § 2244(d)(2).

In addition, equitable tolling can save an otherwise time-barred petition. AEDPA's one-year limitations period is subject to equitable tolling only if a petitioner "shows (1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way and prevented timely filing." Holland v. Florida, 560 U.S. 631, 649 (2010) (internal citations and quotation marks omitted).

Finally, actual innocence is an equitable exception to the statute of limitations. See McQuiggin v. Perkins, 569 U.S. 383, 392–93 (2013). To "present a successful gateway claim of actual innocence a petitioner must present 'evidence of innocence so strong that a court cannot

have confidence in the outcome of the trial unless the court is also satisfied that the trial was free of nonharmless constitutional error.'" Rivas v. Fischer, 687 F.3d 514, 541 (2d Cir. 2012) (quoting Schlup v. Delo, 513 U.S. 298, 316 (1995)). As the Second Circuit has explained,

> To satisfy the Schlup standard, a claim of actual innocence must be both 'credible' and 'compelling.' For the claim to be 'credible,' it must be supported by new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial. For the claim to be "compelling," the petitioner must demonstrate that more likely than not, in light of the new evidence, no reasonable juror would find him guilty beyond a reasonable doubt—or to remove the double negative, that more likely than not any reasonable juror would have reasonable doubt.

Id. (internal citations and quotation marks omitted). This "standard is 'demanding and permits review only in the extraordinary case.'" Id. at 542 (quoting House v. Bell, 457 U.S. 518, 538 (2006)).

### 3. Exhaustion

A court cannot review a habeas petition unless a petitioner "has exhausted the remedies available" in state courts. 28 U.S.C. § 2254(b)(1)(A). The exhaustion requirement is designed to provide state courts with the "'opportunity to pass upon and correct alleged violations of its prisoners' federal rights.'" Jackson v. Edwards, 404 F.3d 612, 619 (2d Cir. 2005) (quoting Picard v. Connor, 404 U.S. 270, 275 (1971)). Therefore, a petitioner must show that he fairly presented his federal claim to the "highest state court capable of reviewing" that claim. Jackson v. Conway, 763 F.3d 115, 151 (2d Cir. 2014) (quoting Rosa v. McCray, 396 F.3d 210, 217 (2d Cir. 2005)); see also Daye v. Att'y Gen. of N.Y., 696 F.2d 186, 190 n.3 (2d Cir. 1982) (en banc). Although the petitioner need not "'cite chapter and verse of the Constitution in order to satisfy this requirement,' he must tender his claim 'in terms that are likely to alert the state courts to the claim's federal nature.'" Jackson, 763 F.3d at 133 (quoting Carvajal v. Artus, 633 F.3d 95, 104 (2d Cir. 2011)).

However, AEDPA recognizes that "[a]n application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State." 28 U.S.C. § 2254(b)(2). This is only appropriate where the claim is "plainly meritless" or "patently frivolous." See Williams v. Artus, 691 F. Supp. 2d 515, 526 (S.D.N.Y. 2010) ("If the unexhausted claims are 'plainly meritless,' the district court can dismiss these claims on the merits.") (citation omitted); Warren v. Goord, No. 06-CV-1423, 2013 WL 1310465, at *11 (E.D.N.Y. Mar. 28, 2013) (collecting cases where courts in this Circuit denied unexhausted claims "upon a determination that they are patently frivolous") (citations omitted).

Additionally, a court may deem unexhausted claims exhausted where the state court to which the petitioner must present those claims would find them procedurally barred. See Jackson, 763 F.3d at 143–44. In those circumstances, the claims are deemed exhausted, but procedurally defaulted. See Clark v. Perez, 510 F.3d 382, 390 (2d Cir. 2008) (citing Coleman v. Thompson, 501 U.S. 722, 735 n.1 (1991)); Aparicio v. Artuz, 269 F.3d 78, 90 (2d Cir. 2001); Reyes v. Keane, 118 F.3d 136, 139 (2d Cir. 1997). The federal court may then only address the merits of the procedurally defaulted claim if a petitioner can overcome the procedural bar in one of the ways described below.

### 4. Procedural Default

A federal court will not review a habeas petition "when the state court's decision rests upon a state-law ground that 'is independent of the federal question and adequate to support the judgment.'" Cone v. Bell, 556 U.S. 449, 465 (2009) (quoting Coleman, 501 U.S. at 729). For this reason, under the doctrine of procedural default, a federal court will not review "the merits of claims, including constitutional claims, that a state court declined to hear because the [petitioner] failed to abide by a state procedural rule." Martinez v. Ryan, 566 U.S. 1, 9 (2012). When a state

court has dismissed a claim on such a procedural ground, the petitioner is procedurally barred from raising that claim in a § 2254 petition unless the petitioner can meet certain exceptions explained below.

The procedural bar applies if the state court decided a claim on such procedural grounds, even if the state court addressed the merits of a claim in the alternative. Velasquez v. Leonardo, 898 F.2d 7, 9 (2d Cir. 1990) (per curiam); see also Harris v. Reed, 489 U.S. 255, 264 n.10 (1989) (observing that "a state court need not fear reaching the merits of a federal claim in an alternative holding" where the court explicitly invokes a procedural rule as an independent ground for its decision) (emphasis in original).

A procedural bar also applies in the context discussed in the previous section i.e., "where 'the petitioner failed to exhaust state remedies and the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred.'" Reyes, 118 F.3d at 140 (quoting Coleman, 501 U.S. at 735) (emphasis omitted).

A petitioner may overcome a procedural bar by demonstrating either (1) "cause for the default and actual prejudice as a result of the alleged violation of federal law" or (2) "that failure to consider the claims will result in a fundamental miscarriage of justice." Coleman, 501 U.S. at 750. To demonstrate cause, a petitioner must establish that "some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule": for example, that the factual or legal basis for a claim was not reasonably available to counsel or that some interference by officials . . . made compliance impracticable." Murray v. Carrier, 477 U.S. 478, 488 (1986) (internal quotation marks and citations omitted). A petitioner may also satisfy the cause requirement by demonstrating that the failure of his attorney to comply with state procedural

rules denied him constitutionally adequate representation. See Tavarez v. Larkin, 814 F.3d 644, 650 (2d Cir. 2016), cert. denied, 137 S. Ct. 106 (2016); see also Restrepa v. Kelly, 178 F.3d 634, 640 (2d Cir. 1999). A petitioner, however, generally cannot invoke this ground unless he first asserted an equivalent independent Sixth Amendment ineffective assistance claim in state court and exhausted his state-court remedies with respect to that claim. See, e.g., Edwards v. Carpenter, 529 U.S. 446, 451–52 (2000).

As for the prejudice requirement, the petitioner must demonstrate that counsel's errors (or any other basis invoked by the petitioner to establish cause) not only "created a possibility of prejudice, but that they worked to his actual and substantial disadvantage . . . ." United States v. Frady, 456 U.S. 152, 170 (1982) (emphasis in original).

Even if a petitioner cannot establish cause and prejudice, a federal court may also excuse a petitioner's procedural default if he can show that a fundamental miscarriage of justice would result: in other words, "that he is actually innocent of the crime for which he has been convicted." Dunham v. Travis, 313 F.3d 724, 730 (2d Cir. 2002) (citing Schlup, 513 U.S. at 321). To prevail, the petitioner must put forth "new reliable evidence . . . that was not presented at trial. Because such evidence is obviously unavailable in the vast majority of cases, claims of actual innocence are rarely successful." Schlup, 513 U.S. at 324.

### 5. AEDPA Standard of Review

If a state court reached the merits of a claim, a federal court may not grant a writ of habeas corpus unless the state court's adjudication of the claim either:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.SC. § 2254(d).  The Supreme Court has construed AEDPA "to give independent meaning to 'contrary [to]' and 'unreasonable.'"  Jones v. Stinson, 229 F.3d 112, 119 (2d Cir. 2000).

A state court's decision is "contrary to" clearly established federal law if "the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts."  Williams, 529 U.S.at 412–13 (O'Connor, J., concurring).  A decision involves "an unreasonable application" of clearly established federal law when a state court "identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of [a] prisoner's case."  Id. at 413.  This standard does not require that all reasonable jurists agree that the state court was wrong.  Id. at 409–10.  Rather, the standard "falls somewhere between 'merely erroneous and unreasonable to all reasonable jurists.'"  Jones, 229 F.3d at 119 (quoting Francis S. v. Stone, 221 F.3d 100, 109 (2d Cir. 2000)).

AEDPA "'imposes a highly deferential standard for evaluating state-court rulings and demands that state-court decisions be given the benefit of the doubt.'"  Jones v. Murphy, 694 F.3d 225, 234 (2d Cir. 2012) (quoting Hardy v. Cross, 565 U.S. 65, 66 (2011) (per curiam)).  This standard is "difficult to meet," and for good reason.  White v. Woodall, 572 U.S. 415, 419 (2014) (quoting Metrish v. Lancaster, 569 U.S. 351, 357–58 (2013)), reh'g denied, 573 U.S. 927 (2014).  A petitioner must show that the "state court's ruling . . . was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement."  Id. at 419–20.

Furthermore, a state court's determinations of factual issues are "presumed to be correct," and the petitioner has "the burden of rebutting the presumption of correctness by clear and

convincing evidence." 28 U.S.C. § 2254(e)(1); see also Lynn v. Bliden, 443 F.3d 238, 246 (2d Cir. 2006). A state court's findings of fact will be upheld "unless objectively unreasonable in light of the evidence presented in the state court proceeding." Lynn, 443 F.3d at 246–47 (quoting Miller-El v. Cockrell, 537 U.S. 322, 340 (2003)). Thus, a federal court may overrule a state court's judgment only if "after the closest examination of the state-court judgment, a federal court is firmly convinced that a federal constitutional right has been violated." Williams, 529 U.S. at 389.

### 6. Petitioner's **Pro** Se Status

Petitioner "bears the burden of proving by a preponderance of the evidence that his constitutional rights have been violated." Jones v. Vacco, 126 F.3d 408, 415 (2d Cir. 1997). In light of Petitioner's pro se status, the Court will construe his submissions liberally and interprets them "to raise the strongest arguments that they suggest." Kirkland v. Cablevision Sys., 760 F.3d 223, 224 (2d Cir. 2014) (per curiam) (quoting Burgos v. Hopkins, 14 F.3d 787, 790 (2d Cir. 1994)). However, a pro se petitioner is not excused "from compliance with relevant rules of procedural and substantive law." Traguth v. Zuck, 710 F.2d 90, 95 (2d Cir. 1983) (quoting Birl v. Estelle, 660 F.2d 592, 593 (5th Cir. 1981) (per curiam) (internal quotation marks omitted)).

## B. Claims for Relief

Petitioner raises six claims in support of his Petition for a writ of habeas corpus: (1) the failure to disclose the source who identified Petitioner for inclusion in the photo line-up constitutes a Rosario violation; (2) the identification procedures used were unduly suggestive; (3) the prosecution improperly bolstered a witness with a prior consistent statement; (4) he was denied his Sixth Amendment right to counsel; and (5) he did not receive a fair plea bargain because he was improperly labeled a third-time violent felony offender. (See Pet., at 5–16.). None of Petitioner's claims present a basis for habeas corpus relief.

### 1. The Petition is Untimely

The New York Court of Appeals denied Petitioner's application for leave to appeal his direct appeal on September 2, 2016.  People v. Madison, 28 N.Y.3d 972 (2016).  Accordingly, Petitioner's judgment of conviction became final 90 days later, on December 1, 2016.  See Valverde v. Stinson, 224 F.3d 129, 132 (2d Cir. 2000) (noting defendant's conviction became final when the ninety-day period to seek review from the Supreme Court expired); see also S. Ct. R. Rule 13(1); 28 U.S.C. § 2244(d)(1)(A).  Petitioner dated his Petition December 2, 2017, one year and one day from when his judgment of conviction became final.  Thus, his Petition is untimely.  See 28 U.S.C. § 2254(d)(1) (stating the one-year statute of limitations from the date a judgment of conviction becomes final).

Petitioner has not attempted to show "(1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way and prevented timely filing" and thus he is entitled to equitable tolling of the statute of limitations.  Holland, 560 U.S. at 632 (internal quotation omitted).  Nor has he made a claim of "actual innocence" to otherwise present an equitable exception to the AEDPA statute of limitations.  See McQuiggin, 569 U.S. at 392–93.  However, Petitioner includes, as an exhibit to his Petition, a letter indicating that he lost his "legal work" on October 13, 2017 so he "was not able to perfect federal habeas the way [he] wished to." (ECF No. 1-1.)  The Court need not reach the question of whether the loss of Petitioner's legal papers near the AEDPA deadline entitles him to equitable tolling because the Petition is utterly meritless.

### 2. Ground One – Rosario Violation

Petitioner alleges that the State failed to "disclose the source by which [his] name was acquired and used to generate [the] photo lineup," which he asserts constitutes a violation of People

v. Rosario, 9 N.Y.2d 286 (1961).[2]  (Pet., at 5.)  This same claim was raised by Petitioner's appellate

counsel on direct appeal, so it is exhausted.  However, in addressing this claim, the Appellate

Division determined it was "unpreserved for appellate review" and "[i]n any event, . . . without

merit."  Madison, 140 A.D.3d 793, 33 N.Y.S.3d 358.  The Appellate Division cited the New York

State preservation statute (N.Y. C.P.L. § 470.05(2)) and New York cases holding that appellate

challenges to Rosario violations are unpreserved if not raised before the trial court.  Id. (citing,

inter alia, People v. Feerick, 93 N.Y.2d 433, 452 (1999)).  As the Appellate Division denied this

claim on adequate and independent state law grounds, Petitioner is procedurally barred from

raising this claim in a federal habeas petition.  See Jacobs v. Connolly, No. 11-CV-5141, 2014 WL

7399295, at *4 (E.D.N.Y. Dec. 30, 2014) (finding Rosario claim in habeas proceeding

procedurally barred where the Appellate Division determined the claim was unpreserved for

appellate review as petitioner failure to properly object in the trial court).

Petitioner cannot show "cause for the default and actual prejudice as a result of the alleged

violation of federal law" to overcome the procedural bar.  Coleman, 501 U.S. at 750.  There is no

indication that Petitioner's trial counsel was ineffective for failing to preserve this claim, because

the record does not show that the hypothetical material he complains of even existed.[3]  Petitioner

claimed on direct appeal that because there was no evidence adduced at trial revealing how the

---

[2]  According to Rosario, where there is evidence in possession of the prosecutor that "relates to the subject matter of the witnesses' testimony and contains nothing that must be kept confidential, defense counsel should be allowed to determine for themselves the use to be made of it on cross-examination."  9 N.Y.2d at 289; see also C.P.L. § 250.45 (codifying the Rosario rule).

[3]  To prevail on an ineffective assistance of counsel claim, a defendant must show that: (1) "counsels' representation fell below an objective standard of reasonableness" and (2) "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  Strickland v. Washington, 466 U.S. 668, 694 (1984).  Petitioner raised a related ineffective assistance claim (asserting that his counsel should have investigated the source by which he was identified) on direct appeal, which the Appellate Division denied without explanation.  Madison, 140 A.D.3d 793, 33 N.Y.S.3d 358.  This decision, if entitled to AEDPA deference, would certainly be upheld, and upon a de novo review, the Court finds that it is plainly correct.

police obtained his name so as to include him in the photo array provided to Lobiondo, there is "clear and unequivocal evidence of a <u>Rosario</u> violation." (Def.-Appellant Br., at 29; <u>see</u> <u>also</u> <u>id.</u> at 22–32.) This is wholly speculative, and the record is utterly devoid of any evidence that there was any colorable <u>Rosario</u> claim for Petitioner's trial counsel to preserve.

Moreover, Petitioner makes no argument that he is "actually innocent" such that "failure to consider the claims will result in a fundamental miscarriage of justice." <u>Coleman</u>, 501 U.S. at 750. Nor would the record support such a finding. Thus, Petitioner cannot overcome the procedural bar to his <u>Rosario</u> claim.

In any event, as an alleged <u>Rosario</u> violation is based upon state law, it "does not present a federal constitutional question upon which federal habeas corpus relief can be granted." <u>Curry v. Bennett</u>, No. 02-CV-3655, 2003 WL 22956980, at *12 (E.D.N.Y. Oct. 17, 2003). However, construing Petitioner's arguments to make the strongest claim possible, his claim could potentially be grounded in the federal analog to <u>Rosario</u>, <u>Jencks v. United States.</u>, 353 U.S. 657, 672 (1957), which requires the government to provide a defendant with all statements related to the subject matter of a government witness's testimony. Even construing the Petition to raise such a claim, the <u>Jencks</u> disclosure requirement is not compelled by the Constitution. <u>See</u> <u>United States v. Augenblick</u>, 393 U.S. 348, 356 (1969) ("[O]ur Jencks decision and the Jencks Act were not cast in constitutional terms."); <u>see</u> <u>also</u> <u>Bogan v. Bradt</u>, No. 11-CV-1550, 2017 WL 2913465, at *5 (E.D.N.Y. July 6, 2017) (collecting cases denying <u>Rosario</u> and <u>Jencks</u> claims raised in habeas petitions because such claims do not form a ground for federal habeas corpus relief).

Accordingly, Petitioner cannot raise any cognizable federal habeas claim regarding a purported violation of <u>Rosario</u> or <u>Jencks</u> disclosure requirements. And, even if Petitioner's claim that the prosecution failed to disclose what source identified him for inclusion in the photo lineup

could somehow implicate the due process mandates of <u>Brady v. Maryland</u>, 373 U.S. 83 (1963), it would fail on the merits because, as discussed above, there is absolutely no evidence in the record that the hypothetical material Petitioner claims should have been turned over exists. Thus, claim one is denied.

### 3. Ground Two –Identification Procedures

In his second ground for habeas relief (which is also exhausted), Petitioner raises substantially the same claims he raised on direct appeal, that the photo array and subsequent corporeal lineups—from which Lobiondo identified Petitioner all three times—were unduly suggestive. (<u>See</u> Def.-Appellant Br., at 33–38.; Pet., at 7.) Specifically, Petitioner: (1) takes issue with the fact that the corporeal lineup took place only two days after Lobiondo reviewed the photo array, and (2) asserts that the physical characteristics of the lineup fillers were too different from his, rendering the lineup unduly suggestive. (<u>See</u> <u>id.</u>)

It is well settled that identification testimony is subject to suppression only when the "identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." <u>Simmons v. United States</u>, 390 U.S. 377, 384 (1968). Accordingly, "identification evidence [is] admissible if (a) the [pretrial identification] procedures were not suggestive or (b) the identification has independent reliability." <u>Raheem v. Kelly</u>, 257 F.3d 122, 133 (2d Cir. 2001) (alteration in original). "The determination of whether an identification procedure violates due process is governed by an extraordinarily general standard that hews closely to the facts of a particular case and turns on a court's judgment in evaluating those facts. . . . [T]his standard calls for an evaluation of the totality of the circumstances." <u>Brisco v. Ercole</u>, 565 F.3d 80, 90 (2d Cir. 2009) (internal citations and quotations omitted). Here, the Appellate Division's holding that "the identification procedures employed by the Suffolk County

Police Department were not unduly suggestive", <u>Madison</u>, 140 A.D.3d 793, 33 N.Y.S.3d 358, is not contrary to, or an unreasonable application of, United States Supreme Court precedent, nor is it based on an unreasonable determination of the facts in light of the evidence before the state court.

There is no Supreme Court case holding that if a lineup is preceded by a photo array, the lineup must take place well after the photo array. Accordingly, the Appellate Division's decision upholding the validity of the timing of the lineup is not contrary to clearly established federal law. Nor was it an unreasonable application of <u>Simmons</u>, or an unreasonable determination of the facts before the state court. Thus, Petitioner has not established that his constitutional rights were violated because Lobiondo identified him in a photo array two days before he identified him in a corporeal lineup. <u>See</u> <u>Epps v. Ercole</u>, No. 09-CV-4802, 2013 WL 2158582, at *11 (S.D.N.Y. May 17, 2013), <u>report</u> <u>and</u> <u>recommendation</u> <u>adopted</u>, No. 09-CV-4802, 2015 WL 4869218 (S.D.N.Y. Aug. 13, 2015) (citing <u>Simmons</u>, 390 U.S. at 383–84) (finding no violation of constitutional rights where witness viewed a photo of petitioner prior to viewing him in a lineup).[4]

Regarding the composition of the corporeal lineup, "the principal question is whether the . . . accused, matching descriptions given by the witness, so stood out from all of the other [fillers] as to 'suggest to an identifying witness that [he] was more likely to be the culprit.'" <u>Jarrett v. Headley</u>, 802 F.2d 34, 41 (2d Cir. 1986) (quoting <u>United States v. Archibald</u>, 734 F.2d 938, 940 (2d Cir.1984)); <u>see</u> <u>also</u> <u>United States v. Hill</u>, 658 F. App'x 600, 605 (2d Cir. 2016) (noting same standard in finding that lineup procedures were not suggestive). The fillers need not have been

---

[4] The <u>Simmons</u> court found that "convictions based on eyewitness identification at trial following a pretrial identification by photograph will be set aside on that ground only if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." 390 U.S. at 384. While Petitioner raises a meritless concern about how he came to be included in the photo array in the first place, there is no suggestion that the photo array itself was impermissibly suggestive. Indeed, the Court has reviewed the photo array and finds that the County Court's decision that it was not remotely suggestive, is plainly correct. (See Photo Line-Up, ECF No. 8-1.)

identical to the Petitioner, so long as Petitioner is not the only participant who meets the description given by the witness. Jarrett, 802 F.2d at 41. Here, Lobiondo described the perpetrator as a black man wearing a black baseball cap, about 5'10" with a skinny build, who looked to be about 20 years old. (July 20 Tr., 69:17–25; July–Aug. Tr., 375:4–9.) The Appellate Division affirmed the County Court's decision that the lineup was "not in the least suggestive." (County Court Decision, July 9, 2010.) Madison, 140 A.D.3d 793, 33 N.Y.S.3d 358. The Court has independently reviewed the photos of the corporeal lineup and finds that the state court's determination is not contrary to, or an unreasonable application of, United States Supreme Court precedent, nor is it based on an unreasonable determination of the facts in light of the evidence before the state court.[5]

Accordingly, claim two is denied.

### 4. Ground Three – The Bolstering Claim

Petitioner next argues that the trial court erred by permitting Detective Acer to testify that Kelsey Mitchell told him Petitioner was acting suspiciously upon learning that she had reported the theft of her vehicle. (Pet., at 8.) This claim was raised on direct appeal and is thus exhausted, with the Appellate Division holding that "the People were properly permitted to rehabilitate [Mitchell] with her prior consistent statement, since defense counsel's cross-examination . . . suggested that a portion of her testimony was a recent fabrication." Madison, 140 A.D.3d 793, 33 N.Y.S.3d 358.

Petitioner claims that Detective Acer's testimony improperly "bolstered" Michell's testimony. (Pet., at 8.) This claim is based on a New York state law which prohibits a witness from corroborating the trial testimony of another witness with pretrial statements of that witness.

---

[5] Petitioner certainly does not so "stand out from the other lineup participants such that the witness would be more likely to identify him as the culprit." Hill, 658 F. App'x at 605. While one of the fillers does appear to have less hair and be of a slightly larger build than Petitioner and the other fillers, the minor difference in appearance of one filler does not render the lineup impermissibly suggestive under Simmons.

People v. McDaniel, 81 N.Y.2d 10, 16 (1993).  Such testimony is admissible, however, if, upon cross-examination, the witness's testimony is challenged as having been recently fabricated.  Id. at 18; see also People v. Ramos, 164 A.D.3d 1267, 1268, 83 N.Y.S.3d 580, 582 (2d Dep't 2018), leave denied, 32 N.Y.3d 1128 (2018) (finding that where counsel challenged the testimony of a witness as a recent fabrication, the trial court "correctly admitted the prior consistent statement of the complainant on direct examination of a law enforcement witness").  As this claim only involves the application of state law and does not present any constitutional issues, it does not provide a basis for habeas review.  See Evans v. Fischer, 712 F.3d 125, 133 (2d Cir. 2013) (noting that there is no "Supreme Court case that clearly establishes that the admission of evidence that improperly bolsters a prosecution witness's testimony constitutes a violation of the Fourteenth Amendment."); see also Bryson v. Sheahan, No. 11-CV-0749, 2013 WL 5502835, at *24 (E.D.N.Y. Oct. 1, 2013) ("Courts in this circuit have repeatedly held that 'the concept of bolstering really had no place as an issue in criminal jurisprudence based on the United State Constitution,' and is a state law evidentiary issue.") (quoting Castadi v. Poole, No. 07-CV-1420, 2013 WL 789986, at *7 (E.D.N.Y. Mar. 1, 2013)).  Thus, claim three is denied.

### 5. Ground Four – Right to Counsel

Petitioner's last exhausted claim is that he was denied his Sixth Amendment right to counsel when the trial court denied his mid-trial request to substitute his attorney.  (Pet., at 10.)  On direct appeal, the Appellate Division determined he was not deprived of the right to counsel of his choice.  Madison, 140 A.D.3d 793, 33 N.Y.S.3d 358.  This decision is not contrary to, or an unreasonable application of, United States Supreme Court precedent, nor is it based on an unreasonable determination of the facts in light of the evidence before the state court.

Petitioner was initially represented by Daniel Barker, an assigned attorney with the Legal Aid Society of Suffolk County. (See Huntley/Wade Hearing.) However, prior to trial, Mr. Barker was injured and hospitalized, so Petitioner was assigned a new attorney, Daniel Russo, pursuant to County Law Article 18-b. (July 15–16 Tr., 4:1–7.) On the first day of jury selection, Petitioner was asked by the trial court judge if he approved of the appointment of Mr. Russo, and Petitioner confirmed that he did. (Id. 4:8–11.) The parties then selected a jury and continued to trial.

When the prosecution was on the verge of resting its case, after 15 witnesses testified over more than five days, Petitioner asked to substitute Mr. Russo with an attorney he claimed his father wanted to hire because he was concerned Mr. Russo was not one hundred percent familiar with his defense. (July–Aug. Tr., 411:15–412:2.) The trial court judge determined that it was too late for Petitioner to change counsel, as the case had been pending for more than a year and he had been given ample opportunity to make choices of this sort prior to trial. (Id. 413:8–414:15.) The judge highlighted the inordinate prejudice it would place upon the prosecution as it would force them to retry the case because the court could not expect the jury to stay beyond the dates originally estimated. (Id.) Thus, the court noted that the request was essentially a request for a mistrial. (Id.)

As the judge would not grant a mistrial, he again emphasized that the trial could not be delayed any longer, so any new attorney would need "to step into Mr. Russo's shoes and try this case from this moment on." (Id. 415:1–10.) No attorney presented himself as ready to assume responsibility. Thus, after reminding Petitioner that he had agreed on the record to Mr. Russo's appointment and substitution as counsel prior to trial, the judge denied Petitioner's application to retain a new attorney. (Id. 415:11–417:18.)

The Sixth Amendment guarantees a right to effective assistance of counsel as part of the fundamental right to a fair trial. See Strickland v. Washington, 466 U.S. 668, 685–86 (1984). It

also guarantees, with some limitations, a right to counsel of one's choosing. See United States v. Gonzalez–Lopez, 548 U.S. 140, 147–48 (2006). However, "[a]bsent a conflict of interest, a defendant in a criminal case does not have the unfettered right to retain new counsel, particularly after trial has commenced." United States v. Paone, 782 F.2d 386, 392 (2d Cir. 1986). "In determining whether to allow a defendant to retain new counsel, the court must consider whether a severance would then be required, the risks and problems associated with the delay, and whether substitutions would disrupt the proceedings and the administration of justice." Id. Accordingly, Petitioner's right to counsel of his choice was constricted by, among other things, "the demands of [the trial court's] calendar," and its power "to make scheduling and other decisions that effectively exclude a defendant's first choice of counsel." Gonzalez–Lopez, 548 U.S. at 152 (internal citations omitted).[6]

Here, Petitioner requested to substitute his counsel at the very end of the prosecution's case. (July–Aug. Tr., 411:15–417:18.) While he claims that he did not wish to delay trial and merely wanted to continue with this potentially retained counsel, (Pet., at 10), there is no indication in the record that the new attorney was available or willing to step in at such a late stage. Furthermore, Petitioner's stated concern with his appointed counsel was that he did not "feel [Russo] knows [his] case in the defense a hundred percent." (See July–Aug. Tr., 411:15–412:2.) The notion that a brand-new counsel—who had missed nearly all the prosecution's case—could be more familiar with Petitioner's defense, is absurd. Accordingly, it was reasonable for the trial court judge to suspect that this request was a delaying tactic.

---

[6] To the extent that seeking to replace counsel at a particularly late stage in the proceedings also requires Petitioner to show "good cause such as a conflict of interest, a complete breakdown of communication or an irreconcilable conflict which leads to an apparently unjust verdict" (even when seeking to substitute a privately retained counsel, not a new appointed counsel), he certainly has not made such a showing. McKee v. Harris, 649 F.2d 927, 931 (2d Cir. 1981).

Considering these factors, coupled with the extremely late stage of the trial, and the fact that granting Petitioner's request would essentially cause a mistrial—substantially prejudicing the prosecution and burdening the court—it was not improper for the trial court judge to deny Petitioner's request to substitute his appointed counsel for one who had possibly been retained by his father.  See United States v. Brumer, 528 F.3d 157, 161 (2d Cir. 2008) (noting that delay is generally "a valid reason to deny a motion to substitute counsel"); Allison v. Khahaifa, No. 10-CV-3453, 2011 WL 3298876, at *13 (E.D.N.Y. Aug. 1, 2011) (denying habeas relief where state trial court denied petitioner's repeated requests for reassignment of appointed counsel and then denied a request for an adjournment of trial for petitioner to retain counsel because he had ample opportunity to do so prior to trial, and there was no evidence he had attempted to retain any specific counsel in a timely manner); Persad v. Conway, No. 05-CV-4199, 2008 WL 268812, at *9 (E.D.N.Y. Jan. 30, 2008) (similarly denying habeas relief where the trial court denied petitioner's request for an adjournment—made just before the jury panel entered the courtroom to commence trial—to retain private counsel, even though petitioner's family had already contacted and begun raising funds to retain a private attorney and the private attorney had represented petitioner on prior occasions).  Thus, the state court's finding that Petitioner was not denied his right to counsel of his choice was not contrary to, or an unreasonable application of, United States Supreme Court precedent, nor was it based on an unreasonable determination of the facts in light of the evidence before the state court.

### 6.  Ground Five – Plea Bargaining

Petitioner's final claim is that he did not receive a fair plea bargain, which he asserts is because the prosecution mistakenly believed him to be a persistent felony offender.  (Pet., at 16.) Petitioner raised this claim in his pro se C.P.L. § 440.10 motion to vacate his conviction, which

the County Court denied in December 2014. (County Court Order, Dec. 18, 2014.) Petitioner did not seek leave to appeal this decision, and the time to do so has long since expired. See C.P.L. § 460.10(4)(a) (providing 30 days to seek leave to appeal). Accordingly, this claim is unexhausted and likely procedurally barred. In any event, even if this claim is not procedurally barred, it is plainly meritless.

The first reference to a plea offer was at the Huntley/Wade hearing in January 2010. The prosecution indicated that Petitioner was initially offered a determinate term of sixteen years imprisonment with five years of post-release supervision, but that the offer was revoked in September 2009. (Huntley/Wade Hearing, 2:17–3:5.) The trial court judge then asked Petitioner to make his own proposal, but his attorney (after consulting with Petitioner) responded, "my client is not interested in any plea bargaining at this point." (Id. 3:6–4:8.) On the morning of August 2, 2010, right at the end of the prosecution's case, the prosecution indicated that it had developed an understanding that Petitioner was a persistent violent felony offender, such that his minimum sentence, if convicted of the burglary charge, was 20 years imprisonment. (July–Aug. Tr., 555:6–560:9.) The trial court judge asked the prosecution to consider a new plea offer under these circumstances, and the prosecution offered Petitioner a sentence of nineteen years to be followed by five years of post-release supervision, indicating that in exchange, it would not introduce proof of both of Petitioner's two prior convictions. (Id. 561:5–563:8.) Petitioner rejected that offer. (Id. 568:5–6.) At the time, all parties indicated that the information about Petitioner's status was new information. (See id., 555:6–557:16, 558:21–560:9, 561:5–13 (testimony that the prosecution developed this erroneous belief "upon further examination of the defendant's record" and the statute the weekend prior; that Petitioner was not aware of the potential sentence until this point; that the prosecution was thus considering a different offer "in light of the fact that th[e] information

was just discovered"; and that it was the first time the County Court had been informed of such a status).)  However, after the lunch recess, the prosecution corrected its mistaken belief about Petitioner's status, and reported that after further review of Petitioner's criminal history, he was not actually a persistent violent felony offender, as he only had one prior violent felony conviction. (Id. 571:18–572:25.)

There is no constitutional "'right to be offered a plea . . . nor a federal right that the judge accept it.'"  Lafler v. Cooper, 566 U.S. 156, 168 (2012) (quoting Missouri v. Frye, 566 U.S. 134, 148 (2012)).  Accordingly, Petitioner had no right to be offered any specific sentence in exchange for pleading guilty.  However, as part of this ground for relief, Petitioner asserts that his attorney did not properly object to the prosecution's mistaken view of his persistent felony offender status, which he believes prevented him from receiving a more favorable plea offer. (Pet., at 16.)  Reading the Petition liberally, this could be construed as a claim that he received ineffective assistance of counsel during plea negotiations in violation of the Sixth Amendment.  See Lafler, 566 U.S. at 168 ("If a plea bargain has been offered, a defendant has the right to effective assistance of counsel in considering whether to accept it.").

The two-part Strickland test applies to challenges to ineffective assistance of counsel during plea negotiations.  Lafler, 566 U.S. at 162–64.  Here, Petitioner cannot show that his counsel's representation fell below an objective standard of reasonableness because (1) Petitioner does not claim he declined to plead guilty on the advice of counsel; and (2) there is no evidence that the prosecution harbored the mistaken belief about his status during the pre-trial plea negotiations, such that counsel could have advocated to correct this mistaken belief.  Indeed, the prosecution's initial offer was sixteen years (Huntley/Wade Hearing, 2:21–3:5.), and the record suggests that there may have also been other plea offers of thirteen and fifteen years prior to trial.

(July–Aug. Tr., 563:15–564:23.)  Had the prosecution believed Petitioner to be a persistent violent felony offender during the pre-trial negotiations, Petitioner's minimum sentence for burglary in the first degree (a Class B felony) would have been twenty years.  See N.Y. Penal Law § 70.08. Furthermore, as outlined supra, the trial transcript indicates that the prosecution only developed this mistaken belief right at the end of trial.  (See July–Aug. Tr., 555:6–557:16, 558:21–560:9, 561:5–13.)  The trial court judge recognized that the timing of this revelation "completely change[d] the impossible [sic] pleas that could be negotiated, (id. 556:10–14), but that Petitioner's persistent violent felony offender status was "something that did not factor into [the] plea discussions prior to trial."  (Id. 559:25–560:4.)  There is simply no evidence that this short-lived mistake played any part in prior plea negotiations such that Petitioner's counsel could have been ineffective during those negotiations.[7]

Moreover, even if Petitioner could establish that his counsel was somehow ineffective in the plea negotiation process, he cannot establish prejudice.  To establish prejudice with respect to a rejected plea offer, he "must show the outcome of the plea process would have been different with competent advice."  Lafler, 566 U.S. at 163.  This requires evidence "that but for the ineffective advice of counsel there is a reasonable probability that . . . [Petitioner] would have accepted the plea . . . ."  Id. at 164.  Again, Petitioner does not assert that he declined to plead guilty on the advice of counsel.  Nor has he offered any evidence that the prosecution would have offered him a better deal if his counsel had brought its apparent mistake to the prosecution's attention.  And, even if the prosecution had offered a "better" deal, there is no evidence that Petitioner would have accepted any plea.  Indeed, when the trial court gave Petitioner the

---

[7] Petitioner also cannot establish that counsel was ineffective for failing to object to this short-lived mistake.  The prosecution corrected its mistaken belief within a few hours, and promptly informed the court.  (Id. 571:18–572:25.) Given the fact that this mistake was quickly corrected by the prosecution, trial counsel's failure to object plainly does not fall below an objective standard of reasonable representation.

opportunity to make his own proposal at the <u>Huntley/Wade</u> hearing, he reported that he was not interested in any plea bargaining. (Huntley/Wade Hearing, 3:13–14:5.) He also seemingly rejected other plea offers prior to trial, and clearly rejected the prosecution's offer of nineteen years offered during this short-lived period when the prosecution mistakenly believed Petitioner to be persistent violent felony offender. (July–Aug. Tr., 563:15–564:23, 568:5–6.) Thus, Petitioner cannot establish ineffective assistance of counsel in the plea negotiation process.

Finally, in describing this claim, Petitioner also seems to suggest that he received an unfair sentence because of this purported mistaken belief that he was persistent violent felony offender. An excessive sentence claim does not present a required federal constitutional issue when the sentence imposed "is within the range prescribed by state law." <u>White v. Keane</u>, 969 F.2d 1381, 1383 (2d Cir. 1992); <u>see</u> <u>also</u> <u>Taylor v. Connelly</u>, 18 F. Supp. 3d 242, 268 (E.D.N.Y. 2014) (noting same). Here, Petitioner's sentence was originally 25 years imprisonment for the conviction of burglary in the first degree, together with an indeterminate term of 3.5 to 7 years imprisonment for the conviction of unauthorized use of a motor vehicle in the first degree, to run concurrently. Both 25 years for the burglary in the first degree (a Class B felony) and 3.5 to 7 for unauthorized use of a motor vehicle in the first degree (a Class D felony) are within the ranges permitted by New York state law. <u>See</u> N.Y. Penal Law §§ 70.00, 70.02, 70.04, 70.06. Moreover, it is again clear from the record that Petitioner was <u>not</u> sentenced as a persistent violent felony offender, but instead was correctly sentenced as a prior violent felony offender. (Sentencing Tr., 7:16–18, 22:3–23:2.) Furthermore, the Appellate Division reduced his sentence for the burglary in the first degree conviction from 25 years to 20 years imprisonment. <u>Madison</u>, 140 A.D.3d 793, 33 N.Y.S.3d 358. Therefore, any claim regarding the propriety of his sentence, if not procedurally barred, is clearly meritless.

Accordingly, Petitioner's fifth claim is denied and there is thus no proper basis upon which the Court can grant habeas relief.

## III. CONCLUSION

For the reasons stated above, the Petition is DENIED. A certificate of appealability shall not issue because Petitioner has not made a substantial showing that he was denied a constitutional right. See 28 U.S.C. § 2253(c)(2). I certify that any appeal of this Order would not be taken in good faith, and thus in forma pauperis status is denied for the purpose of any appeal. Coppedge v. United States, 369 U.S. 438, 444–45 (1962). The Clerk of the Court is respectfully directed to mail a copy of this Order to the pro se Petitioner and to close this case.

**SO ORDERED.**

Dated: July 24, 2019
Central Islip, New York

_____/s/ (JMA_____
JOAN M. AZRACK
UNITED STATES DISTRICT JUDGE